# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

EPIC SYSTEMS CORPORATION,

    Plaintiff,

    v.

FOCUS SYSTEMS, LLC; FOCUS
SOLUTIONS, LLC; NOVO HEALTH
TECHNOLOGY GROUP, LLC; NOVO
HEALTH, LLC; NEW TECHNOLOGY
HOLDINGS, LLC; BRUCE SCHAUMBERG;
JASON LAMINE; and CURT KUBIAK.

    Defendants.

Case No. 3:24-cv-00393

**JURY TRIAL DEMANDED**

**REDACTED**

---

## COMPLAINT

---

Plaintiff Epic Systems Corporation, by and through its attorneys, for its Complaint against

Defendants, Focus Systems, LLC, Focus Solutions, LLC, NOVO Health Technology Group, LLC,

NOVO Health, LLC, NEW Technology Holdings, LLC, Bruce Schaumberg, Jason Lamine, and

Curt Kubiak, alleges as follows:

### <u>NATURE OF THE CASE</u>

1.    Epic researches, develops and provides software and services to help people get

well, stay well, and be healthier. Epic software allows a patient to have a single, comprehensive

medical record that informs and is informed by their health experiences across organizations. Epic

provides software to customers that include community hospitals, academic facilities, children's

health organizations, ambulatory clinics, and multi-hospital integrated health systems. Epic's

integrated software spans primary care, acute and inpatient care, specialty care, access and revenue

cycle, continuing care, population health, and data analytics, among other areas.

2.     Epic is, and always has been, a privately held company.  It has internally developed, installed, and supported its software since its inception in 1979.  The know-how and development of Epic's software is the result of careful, hard work by its employees at a tremendous monetary cost and expenditure of labor-hours over decades.  Epic makes these investments because it is committed to the health and well-being of patients, and the happiness of the healthcare providers and patients using its software.

3.     Epic was approached by NOVO Health in 2019.  NOVO Health is not a healthcare provider, and its CEO, Curt Kubiak, is not a physician.  Kubiak approached Epic with an idea – allow NOVO Health to provide Epic's software to NOVO Health's existing, established, bundled payment plan customers, many of whom were regional orthopedic practices.  NOVO Health represented that it had the resources, personnel and relationships to make this co-op model work.  Epic decided to work with NOVO Health, but with the clear and direct caveat that NOVO Health could not simply resell Epic's software – something Epic does not allow third parties to do.  Rather, NOVO Health could implement a single instance of Epic's software that could be accessed and used by NOVO Health's preexisting healthcare program customers via Epic's affiliate extension framework.

4.     Unbeknown to Epic, NOVO Health and Kubiak had teamed up with an individual named Bruce Schaumberg.  Schaumberg and his partner Jason Lamine own a number of related companies that appear to provide technical services to healthcare providers.  Schaumberg had previously approached Epic in an effort to become a third-party reseller of Epic's software, which Epic did not allow.  He subsequently entered the picture during Epic's discussions with NOVO Health as someone who could provide complementary technical support and hosting services, allegedly through a company named Focus Solutions, in a third-party consultant capacity – not as

2

a licensee of Epic software.

5.      What Schaumberg did not tell Epic, was that he apparently wanted to leverage his access to NOVO Health's instance of Epic to develop an insider's understanding of Epic's software, documentation, schemas, implementation plans and other key intellectual property. The evidence has made clear that Schaumberg intended to use this relationship and access to spin up revenue streams for his and Lamine's related companies (like Focus Systems, Focus Solutions, and XBridge).  He wanted to market himself and those companies as an Epic expert.  And, he wanted to resell Epic's software—contrary to the premise of Epic's potential relationship with NOVO Health. Schaumberg knew Epic did not have resellers of its software because he was told as much in previous discussions, ostensibly while acting on behalf of Focus Solutions.

6.      Not knowing the depth of Schaumberg's involvement or his intentions to use NOVO Health to obtain access to Epic's software, Epic entered into a License Agreement with NOVO Health in July 2020. Behind the scenes, without telling Epic, and mere months after Epic declined Schaumberg's initial attempts to obtain an Epic license, Schaumberg was consummating a transaction to be the largest investor in NOVO Health's Epic project.

7.      Things did not go well.  NOVO Health (now known as NOVO Health Technology Group or NHTG) went live with extending its instance of Epic software to four existing NOVO Health customers in 2021.  When those customers were surveyed on their experience, it was clear they were not happy with the services and support provided by NHTG. When they were surveyed a second time, those customers were not happy. When they were surveyed a third time, those customers were not happy. End user happiness is of critical importance to Epic and its importance was reflected in the terms of the License Agreement. NHTG was clearly and consistently not meeting community standards and Epic treated NHTG consistent with any Epic customer who was

not meeting standards. There were all kinds of problems with the support NHTG's provider customers were receiving from NHTG and it was materially impacting providers' businesses in a negative way. According to NHTG's provider customers, NHTG's performance was negatively impacting their ability to provide patient care.

8.      At the same time, Epic was expending substantial effort in both labor time and expense trying to help NHTG train its people, fix its problems, and get its users happy. Epic even agreed to delay NHTG's payment of millions of dollars of fees owed to Epic for nearly two years to assist NHTG with its finances. It did not work. NHTG's customers were consistently unhappy, and they disclosed very troubling behavior by NHTG and its personnel including alleged threats and harassment. Epic also learned during this time that NOVO Health did not have the money or resources to support this venture from the beginning, and was relying upon insufficient amounts of third party funding to get off the ground. Also unknown to Epic, $3 million of that funding was being contributed by a Schaumberg entity named Focus Systems. Epic also learned that Schaumberg and Kubiak had begun efforts to directly sell Epic's software to third parties with whom NHTG and NOVO Health had no preexisting healthcare business relationships, as expressly prohibited by the License Agreement.

9.      Things got worse for NHTG, including continued user unhappiness, NHTG's customers sending notices of termination to NHTG, more than two years of nonpayment by NHTG to Epic, and the absence of any viable plan to run a solvent business. Under the circumstances, Epic had little choice but to provide notice of NHTG's material breaches. Despite having no obligation to do so, Epic also offered to waive all of its fees and assist NHTG with transitioning its customers to other electronic medical records systems, at Epic's cost, in an effort to minimize the impact to NHTG and its provider customers using NHTG's instance of Epic.

QB\90506899.1

10.     What followed was a campaign of meritless threats, and an unsuccessful, contrived, "involuntary" bankruptcy proceeding coordinated by Schaumberg, Lamine and entities they control in order to avoid termination of Epic's license agreement with NHTG.  Behind the scenes, through various corporate machinations and without Epic's knowledge, Schaumberg and Lamine took control of NHTG away from NOVO Health and Kubiak, and were now completely in charge of NHTG's day-to-day operations.

11.     At nearly every turn, Schaumberg and his entities put their perceived financial interests above that of providers and patients, including by threatening to turn off NHTG's customers' access to their primary electronic medical records systems on two business days' notice, such that the healthcare providers and patients who were using it would lose access to their medical records and data. Because such an act would threaten the continuity of care and patient safety, Epic intervened to help those providers successfully seek injunctive relief from the bankruptcy court, at Epic's significant cost. As a result of these efforts, the plan to abruptly and dangerously cutoff provider and patient access was foiled.

12.     Even after all of these events, NHTG, Schaumberg, and entities Schaumberg controls, continued to make meritless threats against Epic – including thinly veiled attempts to leverage frivolous lawsuits to generate bad press for Epic.  However, it was NHTG, Schaumberg, and entities controlled by Schaumberg and Lamine who had permitted third parties, not subject to any confidentiality obligations to Epic, to access and acquire Epic's confidential and proprietary information under the guise that they were logging in as authorized employees.

13.     Epic's intellectual property, including its confidential information and trade secrets, is of the utmost importance to Epic and the company takes reasonable means to protect those assets including through strict confidentiality agreements with its customers and any contractors that

5

support those customers. Schaumberg and his related entities completely disregarded those obligations and protections.

14. Epic brings this action to protect its intellectual property, enforce its contractual rights, and seek relief for Defendants' various violations of statutes and Epic's common law rights. Epic seeks the damages caused by Defendants' wrongful acts, and injunctive relief preventing Defendants from disclosing or misusing the documents, data, confidential information, trade secrets, and other valuable information it wrongfully took from Epic.

## THE PARTIES

15. Epic Systems Corporation ("Epic") is a Wisconsin corporation with its principal place of business located at 1979 Milky Way, Verona, Wisconsin 53593.

16. Defendant Focus Systems, LLC ("Focus Systems") is a Wisconsin limited liability company with its principal place of business located at W5753 Firelane 12, Menasha, Wisconsin 54952. The members of Focus Systems are Bruce Schaumberg and Jason Lamine. Focus Systems provides information technology services, including but not limited to, hosting and technical support.

17. Focus Solutions, LLC ("Focus Solutions") is a Wisconsin limited liability company with its principal place of business located at 171 Fox Shores Dr., De Pere, Wisconsin 54115. The sole member of Focus Solutions is Bruce Schaumberg. Focus Solutions provides technical services, including but not limited to, data conversion, data migration, and integration assistance.

18. Defendant NOVO Health Technology Group, LLC ("NHTG") is a Wisconsin limited liability company with its principal place of business located at 171 Fox Shores Dr., De Pere, Wisconsin 54115. From its formation on February 21, 2020, through May 30, 2023, NHTG's

sole member was NOVO Health, LLC. From May 31, 2023 to the present NHTG's sole member has been NEW Technology Holdings, LLC.

19.     NHTG is a holding company created for the purpose of holding a License and Support Agreement dated July 8, 2020 between NHTG and Epic (the "License Agreement").

20.     Defendant NOVO Health, LLC ("NOVO Health") is a Wisconsin limited liability company with its principal place of business located at 691 S Green Bay Rd., 168, Neenah, Wisconsin 54956. NOVO Health is not a healthcare provider organization and does not render care to patients. NOVO Health provides direct-to-employer bundled payment programs that connect employers and independent healthcare providers to offer more cost-effective healthcare services.

21.     Defendant NEW Technology Holdings, LLC ("NEW Technology") is a limited liability company with its principal place of business located at 171 Fox Shores Dr., De Pere, Wisconsin 54115. NEW Technology's members are Bruce Schaumberg and Jason Lamine.

22.     On May 17, 2022, NEW Technology became the sole and exclusive manager of NHTG (as opposed to its sole member which happened on May 31, 2023), and was then responsible for managing NHTG, including supervision of all general day-to-day operations.

23.     Bruce Schaumberg is an individual who resides at 171 Fox Shores Dr., De Pere, Wisconsin 54115.

24.     Jason Lamine is an individual who resides at W5753 Firelane 12, Menasha, Wisconsin 54952.

25.     Curt Kubiak is an individual who resides at 123 Ashebrook Pl, Neenah, Wisconsin 54956.

## JURISDICTION AND VENUE

26.     This is an action for trade secret misappropriation, computer fraud, trademark infringement, false designation of origin, breach of contract, and various additional common law business torts.

27.     This Court has subject matter jurisdiction over this matter under 15 U.S.C. § 1121(a) and 28 U.S.C. § 1331 because this is a civil action for trade secret misappropriation, computer fraud, trademark infringement, and false designation of origin, arising under Titles 15 and 18 of the United States Code.

28.     This Court has jurisdiction over Epic's state common law claims pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy as those arising under Titles 15 and 18 of the United States Code.

29.     This Court has personal jurisdiction over the LLC Defendants because they are all domestic limited liability companies and engaged in substantial and not isolated activities within the State of Wisconsin.

30.     This Court has personal jurisdiction over the individual Defendants because they are all domiciled in the State of Wisconsin and engaged in substantial and not isolated activities within the State of Wisconsin.

31.     This Court additionally has personal jurisdiction over NHTG and Focus Solutions because they consented by contract to personal jurisdiction in this District.

32.     Venue in this district is proper under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this District. For example, certain servers wrongfully accessed and from which information and documents were taken are physically present

in this district. Further, the intellectual property and confidential and proprietary information that is the subject of this matter was created in and is situated in this District.

33. Venue in this district is also proper under 28 U.S.C. § 1391 because NHTG and Focus Solutions consented by contract to venue in this District.

## FACTUAL BACKGROUND

## Epic's Trade Secrets and Confidential Information

34. The trade secrets at issue in this matter include Epic's source and object code, proprietary data schema, information concerning the functionality, operation, use, data structures, and development of Epic's software, and information concerning Epic's training, implementation, maintenance and other services ("Epic trade secrets").

35. Defendant NHTG was provided access to Epic trade secrets pursuant to the License Agreement identified below. NHTG's affiliates, who were specifically defined and met certain other criteria ("Affiliates"), were also permitted to access certain Epic trade secrets pursuant to the same agreement.

36. Defendant Focus Solutions, and its direct employees, were granted access to Epic trade secrets pursuant to a Consultant Access Agreement and Customer Schedule identified below.

37. NHTG, NHTG's Affiliates, Focus Solutions and direct employees of Focus Solutions were able to access and obtain Epic trade secrets in one of at least two ways: (1) by logging into NHTG's instance of Epic software hosted by Microsoft Azure; and/or (2) by logging into Epic's customer portal, UserWeb.

38. No other Defendants or individuals were authorized to access the Epic trade secrets. Thus, any accessing of Epic trade secrets by those Defendants, or any other unauthorized individuals, was improper.

QB\90506899.1

39.    The Epic trade secrets accessed and obtained by Defendants, or any other unauthorized individuals, contain information that took decades and billions of dollars to develop, implement and refine.

### Epic's Trademarks

40.    Since its founding in 1979, Epic has used the marks EPIC and **Epic** (hereinafter "EPIC Marks"), in connection with the marketing and sale of its healthcare software and services.

41.    Epic has acquired common law rights in its EPIC Marks through its use of the EPIC Marks in association with Epic's healthcare software and services.

42.    For example, Epic has used the EPIC Marks to promote its healthcare software and services on its official website, www.epic.com, since 1990, which incorporates the EPIC Marks in the domain name.

43.    In addition to Epic's common law rights, Epic owns registrations for many of its EPIC marks.

44.    Epic owns U.S. Registration No. 1,791,373 for EPIC ("the '373 Registration").  The '373 Registration is valid and subsisting, and is *prima facie* evidence of Epic's exclusive right to use the EPIC mark in commerce in connection with "computer programs and accompanying users' manuals sold as a unit for the health care and public health fields" and any related goods and services.  The '373 Registration has achieved incontestable status.

45.    Epic owns U.S. Registration No. 4,206,061 for EPIC ("the '061 Registration).  The '061 Registration is valid and subsisting, and is *prima facie* evidence of Epic's exclusive right to use the EPIC mark in commerce in connection with "Design and development of computer software for use in the healthcare field; implementation and maintenance of computer software for

10

use in the healthcare field; technical support, namely, troubleshooting of computer software problems relative to software used by healthcare organizations; consulting services on the subject of design, implementation, operation, maintenance and troubleshooting of computer software used by healthcare organizations" and related goods and services. The '061 Registration has achieved incontestable status.

46.     Epic owns U.S. Registration No. 5,098,055 for the logo mark **Epic** ("the '055 Registration"). The '055 Registration is valid and subsisting, and is *prima facie* evidence of Epic's exclusive right to use the **Epic** mark in commerce in connection with "Computer programs for for [sic] use in medical and healthcare fields, namely, computer software for managing, acquiring, storing, analyzing, maintaining, processing, structuring, reviewing, building, editing, distributing, communicating, organizing, sharing, referencing, monitoring and integrating information, and accompanying manuals sold as a unit; computer software for automating clinical and administrative healthcare processes" and "Design and development of computer software for use in the healthcare field; implementation and maintenance of computer software for use in the healthcare field; technical support, namely, troubleshooting of computer software problems relative to software used by healthcare organizations; consulting services on the subject of design, implementation, operation, maintenance and troubleshooting of computer software used by healthcare organizations" and related goods and services.

47.     Epic has made substantial investments in promoting its healthcare software and services under its EPIC Marks.

48.     Epic has established goodwill in the EPIC Marks and the healthcare software and services sold under same.

49.     Epic's customers and the public in general have come to know and recognize Epic's

11

EPIC Marks and associate same with Epic and/or Epic's healthcare software and services.

50.     Accordingly, the EPIC Marks are distinctive and have acquired secondary meaning.

51.     Epic has promoted its healthcare software and services under its EPIC Marks throughout the United States for 45 years.

52.     Epic has spent substantial sums of money promoting its healthcare software and services under its EPIC Marks, including through conferences, industry trade shows, and Epic's annual Users Group Meetings.

53.     Epic's healthcare software and services, which are promoted and sold under Epic's EPIC Marks, have received numerous, high-profile awards, including from KLAS Research.

**Defendants' Use of the Epic Marks**

54.     NOVO Health has used, and continues to use, the Epic Marks in promoting a "program for electronic health records" to healthcare providers.  See https://novohealth.com/epic-electronic-health-records-program/ (last accessed June 4, 2024).

55.     NOVO Health's promotion of a program for electronic health records to healthcare providers uses Epic's word mark (EPIC) and Epic's logo mark (*Epic* ).

56.     NOVO Health is using the EPIC Marks to suggest that it is permitted to offer access to, and use of, Epic's software.

57.     NOVO Health was never given permission to use the EPIC Marks in the manner that exists on its website.  In addition, the limited authorization that was provided to mention Epic was terminated with the License Agreement on November 15, 2023.  NOVO Health currently has no authority to offer access to, or use of, Epic's software to anyone.

58.     NHTG has never had Epic's permission to use the Epic Marks, with the exception of a press release, a "case study" flyer, and to preserve certain notices contained in Epic's

confidential and proprietary software code which is not publicly displayed and the access and use of which is subject to strict limited use and confidentiality obligations. Any limited permission to use the Epic Marks was withdrawn on November 15, 2023 when the License Agreement was terminated.

59.    Focus Solutions and Focus Systems have used, and continue to use, the mark EPIC to promote, to healthcare providers, their alleged ability to implement and use Epic's software.

60.    Focus Solutions maintains a website at the domain [www.focushcs.com](www.focushcs.com).

61.    Focus Solutions promotes the sale of goods and services to healthcare providers, and specifically Epic's software, on its website, using the mark EPIC. See [https://www.focushcs.com/wp-content/uploads/2021/10/Case-Study_Epic-on-Azure.pdf](https://www.focushcs.com/wp-content/uploads/2021/10/Case-Study_Epic-on-Azure.pdf) (last accessed May 31, 2024).

62.    Focus Systems is a Microsoft Azure tenant and has maintained listings on the Azure Marketplace that advertise the services of Focus Solutions to healthcare providers, and specifically the use of Epic's software, using the mark EPIC. Focus Systems has never had Epic's permission to use the Epic Marks.

63.    Focus Solutions has never had Epic's permission to use the Epic Marks as presented on its website or the Azure website.

64.    In July 2022, Epic raised concerns with Schaumberg about the reference to Epic in the Azure Marketplace.

65.    On July 21, 2022, Schaumberg agreed to "hide the listings."

66.    After a subsequent meeting, Schaumberg agreed that the Azure Marketplace listings referencing Epic would not be made public unless he later sought and received permission from Epic. Schaumberg did not seek such permission.

**Epic Rejects Schaumberg's Overtures to Resell Epic's Software**

67.     In March, 2018, Schaumberg reached out to Epic claiming that his company, Focus Solutions, had relationships with healthcare providers who were interested in gaining access to Epic's software.  In response, Epic informed Schaumberg that Epic does not permit entities or individuals to simply resell its software.

68.     Throughout 2018 and 2019, Schaumberg reached out to Epic and volunteered to arrange introductions to various businesses Schaumberg claimed were interested in Epic's software.

69.     Schaumberg volunteered to stay on the "sideline" and did not raise any concerns about Epic working directly with any of the entities he identified.

70.     Epic did not contract with any of Schaumberg's contacts.

**Kubiak Pitches NOVO Health to Epic**

71.     In or around May, 2019, Epic was introduced to Curt Kubiak of NOVO Health.

72.     Kubiak described NOVO Health's business as providing direct-to-employer bundled payment programs that connect employers and independent healthcare providers to offer more cost-effective healthcare services.

73.     Kubiak wanted to supplement NOVO Health's existing offerings to NOVO Health partners by extending Epic's software to NOVO Health's existing bundled payment partners, some of whom had previously used Epic through Epic's Community Connect program.

74.     Epic's Community Connect program was created in 2007 and permits Epic's customers to extend their instance of Epic software to allow clinics, hospitals, and other care settings in their area to use their Epic instance to create a shared and holistic patient record.

QB\90506899.1

75.     Kubiak presented NOVO Health as an established, successful business with established contractual relationships and over 160 doctors interested in investing in licensing Epic's software.  He said NOVO Health did not need Epic to make money.

76.     Throughout August and September, 2019, Epic and NOVO Health had many discussions about NOVO Health's desired application mix, its expected clinical volumes, pricing and other issues needed to finalize a pricing proposal.

77.     At NOVO Health's request, Epic prepared multiple pricing proposals, including a proposal for Epic Hosting to host (physically maintain the computer infrastructure) the instance of Epic's software that would be remotely accessed.

78.     In February, 2020, Epic spoke with Schaumberg who stated that he was introduced to Kubiak through mutual connections.  Schaumberg said he was interested in providing resources on the hosting end, if NOVO Health decided to self-host.

79.     In February, 2020, NOVO Health agreed on pricing and informed Epic that it would not use Epic Hosting.

80.     Schaumberg never informed Epic about his plans for investing in NHTG and formally collaborating with NHTG on operation and management.

**The License and Support Agreement Between Epic and NHTG**

81.     Epic and NHTG entered into the License Agreement effective July 8, 2020. Immediately prior to signing the License Agreement, NOVO Health asked that its wholly owned subsidiary, NHTG, be substituted as the contracting party.  NOVO Health did not offer an explanation for this switch and Epic did not inquire because the use of holding companies by its customers was not out of the ordinary and because Epic trusts its customers by default.

82.     The License Agreement granted NHTG "a non-exclusive, perpetual license to use the Program Property in the United States, subject to the terms of this Agreement."  It did not grant NHTG ownership of any part of the Program Property, making clear that "[t]his Agreement does not give You ownership of any part of the Program Property".

83.     Exhibit 1 to the License Agreement identified the Program Property licensed to NHTG as well as the applicable fees for the Program Property.  The license fees were payable according to a time value of money adjustment and financing schedule in Exhibit B to the License Agreement.  The implementation fees were payable in accordance with an Implementation Item Payment Schedule contained in Exhibit 1-1 to the License Agreement.

84.      The License Agreement set forth NHTG's obligation to pay license fees, subscription fees, third party fees, Epic hourly fees, and maintenance fees.

85.     The License Agreement contains confidentiality provisions that prohibit the disclosure of "Epic Confidential Information" defined as:

> "Epic Confidential Information" means, except as provided below, all information concerning: the functionality, operation, use, code, data structures, or development of either Epic software (including the Program Property) or Third Party Software and Data; Proprietary Data Schema; Epic's training, implementation, maintenance and other services; and this Agreement's terms. "Epic Confidential Information" excludes information: (a) generally available to the public without fault by You; (b) rightfully known by You non-confidentially before Epic first provides You access to such information; (c) independently developed by You without use of any Epic Confidential Information; or (d) rightfully obtained by You from a third party with the right to disclose it non-confidentially.

86.     In addition to the confidentiality requirements noted above, the License Agreement also imposed heighted confidentiality and use restrictions applicable to its source code.

### Epic Prohibits Reselling Its Software

87.     Negotiations regarding the License Agreements began in the Fall of 2019.

88.     The negotiations addressed expectations as to how Epic's software would be accessed and used by NOVO Health and extended to existing NOVO Health bundled payment partners.

89.     Sandra Rochon (NOVO Health's COO) and Angela Rust (NOVO Health's General Counsel) were directly involved in negotiations regarding the License Agreement.

90.     Epic informed NOVO Health representatives repeatedly that it does not permit entities to resell Epic's software.

91.     Traditionally, Epic licenses its software directly to health care providers because it has found that direct engagement between Epic and those who use its software results in the happiest providers and patients.  Accordingly, Epic does not permit entities who are not healthcare providers to simply resell instances of Epic's software to third parties.  Rather, in certain circumstances, Epic allows entities to extend the use of their own instance of Epic's software to providers with whom they have a relationship.

92.     Epic informed NOVO Health that it would not permit NOVO Health to directly market Epic's software to potential customers, and that Epic's software could not be the primary driver of signing up new bundled payment partners.  Epic stated that the License Agreement would need to include language that the NOVO Health relationship with its bundled payment partners is not driven by access to Epic's software.

93.     NOVO Health representatives, including Rochon and Rust, confirmed that NOVO Health had no intent to be a reseller of Epic software.  Rust confirmed this in writing on December 13, and December 19, 2019.

94.     The License Agreement contained provisions that restricted to whom NHTG's instance of Epic could be extended as Affiliates, prohibited the reselling of Epic's software, and prohibited using access to Epic's software as an incentive to recruit new customers.

95.     Section 11 of the License Agreement addressed use of Epic's Program Property by Affiliates.

96.      The License Agreement contains a definition of Affiliate that requires a proposed affiliate to meet certain criteria, including:

   a)     An Affiliate was restricted to a "NOVO Health Provider" **approved by Epic** in writing.

   b)     A "NOVO Health Provider" was limited to "a physician or healthcare organization that (i) provides healthcare directly to patients; (ii) shares or will share [NHTG's] existing Production Directory; (iii) has in effect an agreement with [NOVO Health] to participate as a healthcare provider in at least one Healthcare Program offered through the NOVO Health Market other than a program granting access or allowing the use of [Epic's EHR]; and (iv) has in effect a business associate agreement directly or indirectly with [NOVO Health]."

   c)     A "Healthcare Program" was defined as "a program that primarily involves the delivery of healthcare services to patients."

   d)     Granting access to NHTG's instance of Epic's EHR **could not be the primary purpose** of NOVO Health's relationship with a NOVO Health Provider.

97.     Even if an entity met these requirements, Epic retained the discretion to approve or deny access to NHTG's instance based on consideration of several factors, including:

   a)     Whether NHTG was meeting Epic's then-current Connect program criteria, including user happiness.

   b)     Whether the substantial majority of NHTG's affiliates were satisfied from a clinical and financial perspective.

   c)     The amount of potential patient sharing between the proposed affiliate and NHTG's other Affiliates.

   d)     The ability of the proposed affiliate's practices to accept the set-up of

18

NHTG's instance of Epic and the desire for shared processes and governance structure.

e)      NHTG's success with supporting its instance.

f)      The proposed affiliate's understanding of the financial and practical implications of sharing NHTG's instance.

98.      Section 11(a)(vi) of the License Agreement required NHTG to cease all sales and implementation activities with Affiliates unless and until approved by Epic in writing after Epic informed NHTG of concerns about how NHTG was extending or supporting its Affiliates.

### The Consultant Access Agreement Between Epic and Focus Solutions and Customer Schedule Between Epic, Focus Solutions and NHTG

99.      Epic and Focus Solutions entered into a Consultant Access Agreement ("CAA") effective July 27, 2020.

100.      The CAA bestowed Focus Solutions with a limited right to access, disclose and use Epic Confidential Information according to the scope identified in a Customer Schedule. Even then, the CAA contained other restrictions limiting access, disclosure and use of Epic's information, including but not limited to:

a)      Limiting access to and use of Epic's software to the minimum amount necessary in order to provide the services in the Customer Schedule.

b)      Ensuring that security profiles are limited.

c)      Contracting directly with the customer (NHTG) to provide the services.

d)      Limiting access to direct employees of Focus Solutions who need that access to provide the services.

e)      Refraining from providing access to any subcontractors in the absence of a Customer Schedule that identifies the subcontractor.

f)      Refraining from transmitting or storing Epic Confidential Information on any devices owned by Focus Solutions or its employees.

g)      Requiring each team member of Focus Solutions to have a unique user ID and password.

19

h)      Establishing policies and procedures that are actively monitored and enforced to deactivate credentials for team members who no longer need access.

i)      Implementing policies forbidding team members from disclosing or permitting access to Epic Confidential Information, including to third parties or other employees of Focus Solutions or its Affiliated Companies.

j)      Refraining from accessing any Epic Software source code.

k)      Providing written notification to team members of the obligations under the CAA prior to their access.

101.    Focus Systems was not a party to the CAA. Focus Systems was not a Designated Subcontractor under the CAA. The CAA did not provide Focus Systems or any of its employees or subcontractors with any right to access or use Epic Confidential Information.

102.    Epic, Focus Solutions and NHTG entered into a Customer Schedule effective July 31, 2020.

103.    The Customer Schedule defined the "Limited Epic Software" Focus Solutions was permitted to access in providing certain, defined services to NHTG.

104.    The Customer Schedule permitted the defined access only to the extent needed for Focus Solutions to perform the services.

105.    The Customer Schedule also stated that Focus Solutions' use of Epic's software was also expressly subject to all of the restrictions set forth in the License Agreement.

106.    Focus Systems was not a party to the Customer Schedule. The Customer Schedule did not provide Focus Systems or any of its employees or subcontractors with any right to access or use Epic Confidential Information.

**Unauthorized Access To and Misappropriation of**
**Epic Confidential Information Including Epic Trade Secrets**

107.    The only entities that were permitted to access and use Epic Confidential Information were employees of NHTG and its Affiliates, direct employees of Focus Solutions, and

any consultant who had a CAA and Customer Schedule in place with Epic and NHTG.

108.    No subcontractors of Focus Solutions were permitted to access or use Epic Confidential Information.

109.    No employees or subcontractors of Focus Systems were permitted to access or use Epic Confidential Information.

110.    Contrary to the terms of the License Agreement, CAA and Customer Schedule, NHTG and Focus Solutions permitted unauthorized third parties to access, obtain and use Epic Confidential Information.

111.    Upon information and believe, Focus Systems was the Microsoft Azure tenant and contracted directly with Azure to host NHTG's instance of Epic.  As the tenant, Focus Systems had access to, and accessed, Epic Confidential Information, including but not limited to NHTG's instance of Epic (and all of the corresponding source code).  Epic was never told that Focus Systems was providing hosting services for NHTG.

112.    Upon information and belief, certain Focus Systems employees and subcontractors were provided with unauthorized access to Epic Confidential Information.

113.    These unauthorized third parties were provided credentials by NHTG and/or Focus Solutions to access NHTG's instance of Epic and Epic's UserWeb.

114.    The credentials provided to these unauthorized third parties used email addresses with domains for either NHTG (novohtg.com) or Focus Solutions (focushcs.com), falsely suggesting that the unauthorized users were direct employees of authorized entities.

115.    The unauthorized third parties also identified their employers as either NHTG or Focus Solutions when completing the login process and agreeing to the terms of Epic's UserWeb agreement.

116. Neither NHTG, NOVO Health, Focus Solutions, nor Focus Systems identified the unauthorized users as employees or subcontractors of unauthorized entities.

117. NHTG, NOVO Health, Focus Solutions and Focus Systems thereby deceived Epic into providing third parties, who had no separate contractual obligations of confidentiality, with access to Epic Confidential Information.

118. Such unauthorized access occurred between September, 2020 and October, 2023.

### Wrongful Efforts to Resell Epic's Software

119. In the Fall of 2020, NHTG began trying to resell its instance of Epic to entities across the country who had no prior relationship with NOVO Health.

120. One of the entities NHTG approached was Hatfield Medical Group in Arizona.

121. Epic reminded Rochon and Kubiak that they could not simply resell, and to leave the topic of Epic's software out of the initial discussions with potential NOVO Healthcare Providers (see paragraph 96 above for definition).

122. Epic also instructed Rochon and Kubiak to instruct Schaumberg not to attempt to resell Epic's software. They agreed to do so.

123. In October 2020, without Epic's permission or knowledge, NHTG targeted a group in New Orleans with the prospect of accessing and using Epic's software.

124. In December 2020, NHTG targeted BASS Medical Group with access to Epic's software as the driver of the discussion.

125. BASS Medical would not have otherwise been interested in NHTG without the prospect of using Epic's software.

126. Upon information and belief, NHTG understood that its business practices were violating the terms and spirit of the License Agreement.

127.   In January 2021, Kubiak specifically requested an "exemption" to allow BASS Medical to access and use NHTG's instance of Epic.

128.   Epic declined this request and reminded NHTG, multiple times, that it is not a reseller of Epic's software and may not use Epic's software as the basis for convincing a new entity to sign up for NOVO Healthcare Programs.

**NHTG's Additional Failures to Perform in Accordance with the License Agreement**

129.   In or about January 2021, NHTG stopped paying Epic the contractually required fees.

130.   Even after NHTG's first Affiliate went live around April 2021, NHTG failed to pay Epic the contractually required fees.

131.   After NHTG's first Affiliates were live, Epic began assessing whether NHTG was meeting the then-current Connect program criteria, a factor Epic was entitled to rely upon in deciding whether to approve or deny additional affiliates.

132.   One of the most important factors Epic considered in exercising its sole right to approve or deny a proposed Affiliate was whether NHTG's existing Affiliates were happy.

133.   As with all of Epic's customers and their Connect sites, measuring happiness was done through direct surveys to the end-users at NHTG's existing Affiliates.

134.   This survey requirement was built into the License Agreement in the definition of Affiliate – "whether You are meeting Epic's then-current Connect program criteria."

135.   The first Connect program criterion was "Surveys – Connect sites are happy and feel well supported."  Compliance required a minimum average survey score of 7 out of 10 from both end-users and leadership.

136.   The first surveys of NHTG's Affiliates ("Post Live" surveys) were done between

June 29 and July 14, 2021. The average score for overall happiness, based on surveys of nearly 100 end-users, was between 4 and 6 out of 10, which failed to meet the Connect program criteria.

137. Epic and NHTG discussed the importance of improving user happiness and began working to achieve the then-required Connect accreditation.

138. Epic and NHTG agreed that NHTG would focus on fixing the experience with its existing installs and focus future growth on entities in Wisconsin and surrounding states.

139. Notwithstanding this agreement, in early 2022, Epic started receiving requests for approvals for entities who were not contractual participants in any NOVO Health Program.

140. Epic reminded NHTG of the need to get its users happy and to work toward meeting Epic's then-current Connect program criteria.

141. Meanwhile, NHTG was still not paying Epic.

142. NHTG repeatedly assured Epic that it would pay the amounts due. This included representations that NHTG had developed a realignment strategy, new business plans, and was about to obtain financing.

143. In April 2022, out of concern for NHTG's viability, Epic sought financial information regarding NOVO Health, the entity that purportedly had the existing contractual partnerships that would present opportunities for NHTG to extend its instance of Epic.

144. NOVO Health provided financials for the period 2018-2020 (before any expenses related to Epic), and the results revealed:



REDACTED

QB\90506899.1

**REDACTED**

145.    NOVO Health previously failed to disclose that it was severely **REDACTED**

**REDACTED**

146.    Epic also learned that NHTG's first year of operations with Affiliates (2021) generated 63,736 visits, less than half of the volume NHTG had projected for those same Affiliates (153,000).

147.    NHTG never offered a viable proposal to become profitable.

148.    In May 2022, NHTG proposed a "realignment strategy" to achieve profitability. The "realignment strategy" was highly inconsistent with NHTG's past performance and filled with unrealistic projections.



**REDACTED**

152.    NHTG was unable to provide evidence that many of the proposed entities had "in effect" an agreement with NOVO Health to use a NOVO Healthcare Program, a precursor to consideration of approving Affiliate access to NHTG's instance of Epic.

25

153. While discussions about NHTG's viability were underway, NHTG asked Epic to approve a new affiliate named Neuragenex. Epic declined for a number of reasons, including, that NHTG had not achieved Connect accreditation, NHTG had not provided evidence that Neuragenex had an existing contractual relationship for a NOVO Healthcare Program, Neuragenex did not have a signed Business Associate Agreement, and it was not clear if that entity was even a healthcare provider.

154. On May 24, 2022, NHTG signed a contract with Neuragenex to provide access to NHTG's instance of Epic without Epic's knowledge or approval. In a later meeting, Epic reluctantly agreed to allow the Neuragenex relationship to proceed.

155. NHTG asked Epic to resurvey its Affiliates and the results of additional surveys came back in October, 2022. The results showed an average happiness score of 5 out of 10, again failing to meet Connect accreditation.

156. As a result of the continued poor survey scores, Epic instructed NHTG not to proceed with the Neuragenex implementation. NHTG ignored Epic's instructions and proceeded anyway.

157. In October 2022, two of NHTG's Affiliates provided notice that they were terminating their agreement with NHTG and transitioning to a different electronic health record. NHTG failed to inform Epic of this development as required by the License Agreement.

158. In November 2022, NHTG provided Epic with "five year financial projections" in an effort to assure Epic that it would ultimately be paid. The projections included:



REDACTED

159.     In response to the unrealistic projections, Epic asked NHTG to continue working on client satisfaction, agreed to conduct more surveys at NHTG's request, and offered a 12-month payment plan for the $4.4 million then-owed to Epic.  NHTG responded with a request to structure the repayment over five years, until 2027.

160.     By February 2023, NHTG owed Epic $5.4 million in unpaid fees and had not come forward with any reasonable plan for repayment or financing.  NHTG modified its prior request by seeking a payment plan structuring payments through 2026.

161.     On February 4, 2023, Epic sent a letter to NHTG providing notice that NHTG was in material breach of Subsections 4(a), 4(e), 4(g), 4(h), 4(i), and 4(j) of the License Agreement, and that NHTG currently owed Epic $5,432,493.49, as set forth in an accompanying statement of account.  Epic noted NHTG had sixty days to cure and, if NHTG was not capable of curing, offered to waive the outstanding fees if NHTG cooperated with transitioning its remaining Affiliates to other systems consistent with its commitment to do so under Section 11 of the License Agreement.

162.     By February 20, 2023, the additional round of surveys were complete and the result was an overall happiness score of 6 out of 10, which still did not meet the Connect criteria.

163.     Separately, in February 2023, a representative of Orthopedic & Sports Institute of the Fox Valley ("OSI"), one of the original NOVO Healthcare Provider groups approved as an Affiliate, informed Epic that it was planning to move off of NHTG's instance.  According to OSI:

a)     NHTG had not made any fixes since the Fall of 2021 and OSI believed the support from NHTG had gotten worse.

b)     The problems impact OSI's financials, billing cycles and day-to-day work.

c)     The new project manager hired by NHTG was inexperienced and did not know EHRs.

d)     The VP representative at NHTG was defensive, uncooperative, blamed other people, and was unprofessional.

e)     After the survey results, NHTG came onsite in January 2023 and took note of issues that had been in unaddressed service tickets for a year. OSI never heard anything from NHTG after that visit.

f)     OSI's physicians were not happy, yet NHTG was instructing them to rate NHTG higher merely because they came onsite to help. In exchange, NHTG would not take them to court.

g)     Hundreds of help tickets remained sitting in the queue without any attention.

h)     Alarmingly, the representative of OSI described NHTG and Mr. Schaumberg's conduct as "threatening" and "beyond harassment."

164.    The providers at NeuroSpine Center of Wisconsin, another of the original NOVO Healthcare Provider groups approved as an Affiliate, were also not happy. According to NeuroSpine, there were a lot of "balls dropped" and inappropriate behavior.

165.    By June 2023, Neuragenex sent a letter notifying NHTG that Neuragenex was terminating its contract with NHTG due to material breaches including insufficient revenue cycle management reports, a defective patient registration and eligibility process, and inadequate note automation. Neuragenex also noted that other performance by NHTG had been unsatisfactory over the entire duration of the relationship, including taking over ten months for the system to accept credit card payments, premature statements, and inability of administrators to access documentation.

166.    As of May 31, 2024, NHTG owes Epic $7.3 million in unpaid fees, inclusive of interest. In addition, NHTG owes Epic an additional $2.1 million in license fees that were owed on the date the License Agreement was signed, and would have been invoiced in the future according to the Schedule in Exhibit B-1 to the License Agreement.

QB\90506899.1

## Schaumberg's and Lamine's Secret Takeover of NHTG and Interference With Epic's Rights

167.    After the License Agreement was signed, Epic was asked to approve Focus Solutions as a consultant to assist with implementing and maintaining NHTG's instance.  The CAA with Focus Solutions was effective July 27, 2020.

168.    To Epic's understanding, the involvement of Schaumberg and Focus Solutions with NHTG was solely on the technical side, assisting with the implementation and operation of NHTG's instance in a consultant role as set forth in the CAA and Customer Schedule.  Neither NHTG nor Schaumberg disclosed or explained the true and complete nature of the relationship.

169.    On November 17, 2020, a different entity owned by Schaumberg and Lamine, Focus Systems, entered into a "Collaboration Agreement" with NHTG to jointly develop what they called the "EPIC Program."

170.    The collaboration was done without Epic's knowledge, permission or involvement.

171.    The Collaboration Agreement purported to focus on a turn-key set of licenses, products and services needed to successfully access, implement, and maintain "the EPIC EHR," and to continuously seek opportunities to offer and provide the "EPIC Program" to more healthcare providers.

172.    The Collaboration Agreement purported to be a "framework" for pursuit and delivery of individual customer projects involving "the sale of the EPIC Program to health care providers."

173.    The Collaboration Agreement referenced NHTG's contract with Epic, but made no mention of the fact that NHTG was prohibited from reselling Epic's EHR and that NHTG was prohibited from using its instance as a basis for establishing new relationships with NOVO Health Providers.

174.    Nor did the Collaboration Agreement account for the requirement that any discussion of allowing access to NHTG's instance of Epic software could only occur with existing, contracted NOVO Health customers who were already participating in a NOVO Healthcare Program from the NOVO Health Market.

175.    The Collaboration Agreement did not recognize that Epic retained the discretion to approve or deny the addition of Affiliates.

176.    The Collaboration Agreement was premised on reselling Epic software, contrary to the License Agreement, contrary to prior conversations between Epic and NOVO Health, and contrary to prior conversations between Schaumberg and Epic.

177.    In the Collaboration Agreement, Focus Systems agreed to provide $3 million to the joint effort and provide certain Focus Systems employees who would assist with implementation and operation of NHTG's instance.

178.    Epic later learned that Schaumberg had been working with Kubiak on this joint development effort as early as 2019 without any disclosure of the collaboration and plan to Epic. Epic did not learn about the plan until NHTG's bankruptcy proceeding in 2023.

179.    In October 2020, Schaumberg began reaching out to third parties, who had no contractual relationship with NOVO Health, with the idea that they could use Epic's software.

180.    By the end of 2021, NHTG was in financial distress, even without having paid Epic since early 2021.

181.    On April 12, 2022, Schaumberg and Lamine formed an entity named NEW Technology Holdings, LLC.

182.    By May 17, 2022, NEW Technology Holdings and NOVO Health entered into a Management Services Agreement making NEW Technology Holdings the manager of NHTG and

30

giving Schaumberg and Lamine complete authority over the day-to-day operation of the business.

183.    The agreement also gave NEW Technology Holdings the option to purchase all the equity of NHTG for $1 subject to NEW Technology Holdings satisfying NHTG's outstanding debt, including all amounts owed to Epic.  Epic was not apprised of this agreement.

184.    Schaumberg and Lamine were in charge of managing the day-to-day operations of NHTG when Neuragenex was signed up over Epic's objections.

185.    Schaumberg and Lamine were in charge of NHTG while NHTG continued failing to adequately engage with its Affiliates to correct their myriad problems and improve their happiness.

186.    Schaumberg and Lamine were in charge of NHTG while NHTG continued to avoid paying Epic, continued to make deferral requests, and continued to assure Epic that financing would be secured and Epic would be paid.

187.    After Epic sent its February 4, 2023 letter notifying NHTG of its material breaches, which if not cured would trigger a termination right, Schaumberg and Lamine were responsible for putting NHTG into an "involuntary" bankruptcy commenced by other entities owned and controlled by Schaumberg and Lamine.

188.    On April 4, 2023, Focus Solutions, Focus Systems, and NEW Tech Holdings, LLC, filed an Involuntary Petition for bankruptcy against NHTG.

189.    NEW Tech Holdings, LLC is different than the NEW Technology Holdings referred to above.  NEW Tech Holdings was doing business as XBridge and appears to have acquired the assets of XBridge, LLC, a company formerly owned by Schaumberg and Joshua Portnoy, M.D.

190.    Schaumberg and Portnoy were the members of Focus Solutions at the time the

bankruptcy was commenced, but Portnoy's 49% membership interest was allegedly redeemed in September 2023. Schaumberg was also a member of both Focus Systems and NEW Tech Holdings, along with Lamine.

191. At the time the bankruptcy was commenced, Schaumberg and Lamine owned and controlled the manager of NHTG, controlled its day-to-day operations, and controlled the three petitioning creditors.

192. Schaumberg admitted that the bankruptcy was filed to stop the clock on Epic's possible termination of the License Agreement and to force Epic to the table.

193. After the bankruptcy was commenced, Defendants' attorneys began threatening Epic with contrived, meritless litigation and false allegations that Epic refused to engage in discussions with NHTG.

194. On May 31, 2023, without Epic's knowledge or involvement, NEW Technology Holdings and NOVO Health entered into a Membership Interest Purchase Agreement whereby NEW Technology Holdings exercised its right under the Management Services Agreement to purchase the equity of NHTG from NOVO Health for $1.

195. NEW Technology Holdings did not satisfy all of NHTG's outstanding debt, as required by the Management Services Agreement.

196. On May 31, 2023, Schaumberg and Lamine were the sole members and owners of Focus Systems, Focus Solutions, and NEW Technology Holdings (which itself was the sole member of NHTG).

197. Schaumberg and NHTG never made an offer that would pay off the amounts owed to Epic.

198. On July 14, 2023, Schaumberg threatened to cause NHTG to terminate its

remaining Affiliates' access to NHTG's instance of Epic on two business days' notice and without an opportunity for the Affiliates to reasonably transition to a different electronic health records system or preserve their patients' data. As a purportedly seasoned Health IT consultant, Schaumberg knew, or should have known, that such action had the potential to threaten the continuity of safe and effective care.

199. In response to Schaumberg's threat, Epic worked with the remaining Affiliates to file an Emergency Motion to stop the harm that would result to the Affiliates, their providers and their patients. During a hearing on a temporary restraining order, Schaumberg and his entities finally backed away from the threat and, for the first time, from the witness stand, agreed to keep NHTG's instance live.

200. Ultimately, Schaumberg and his various entities mismanaged the bankruptcy so badly that the Court dismissed it on November 15, 2023. Order dated November 15, 2023, dkt. 167, *In re NOVO Health Technology Group, LLC*, Case No. 23-21460-gmh (Bankr. E.D. Wis.).

201. On November 15, 2023, 284 days after Epic provided NHTG with notice of its material breaches and an opportunity to cure, Epic terminated the License Agreement, the CAA and the Customer Schedule, and demanded that Defendants destroy any Epic Confidential Information within their possession or custody as provided for in the applicable contracts.

202. Despite multiple follow up demands, it was not until April 27, 2024 that Schaumberg provided an Affidavit, on behalf of NHTG and Focus Solutions, that Epic's Code, Documentation and Epic Confidential Information were destroyed allegedly in accordance with the applicable contracts. Schaumberg's Affidavit was silent as to copies of Code, Documentation or Epic Confidential Information in the possession of any other entity, including Focus Systems,

NOVO Health, NEW Technology Holdings, Microsoft Azure, or independent contractors who were improperly provided access to Epic's information.

### FIRST CAUSE OF ACTION
Defend Trade Secrets Act (18 U.S.C. § 1836)
(against Focus Systems, Focus Solutions, NHTG, and Schaumberg)

203.    Epic realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 202 above.

204.    The Epic trade secrets identified in Paragraphs 34 through 39 above constitute protectable trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1839(3) and such information is proprietary and confidential to Epic.

205.    The Epic trade secrets both consist of, and relate to, products and services that are used in interstate and foreign commerce with Epic customers around the world.

206.    Epic derives independent economic value from the Epic trade secrets because they are not generally known and not readily ascertainable by proper means to Epic's competitors who could obtain value from their disclosure.

207.    Epic invested multiple decades and billions of dollars developing, refining and improving its Code, Proprietary Data Schema and other identified trade secrets.  This investment has resulted in Epic being rated #1 Overall Software Suite by KLAS industry rankings for the last 13 years.

208.    Epic takes significant steps to maintain the secrecy of the information, including by restricting access to Epic customers, consultants (including Focus Solutions), and others who sign confidentiality agreements and other use restriction agreements.  Epic also uses physical and technological restrictions to protect the Epic trade secrets.

209.    Epic has taken reasonable measures to protect and maintain the secrecy and

confidentiality of the Epic trade secrets.

210. The Epic trade secrets are not generally known in the industry or to the general public, and their secrecy confers substantial economic advantage and benefit to Epic. Knowledge of the information would also confer a substantial economic benefit to Epic's competitors and other developers in the health IT market who would get a substantial head start in their efforts to understand the needs of the healthcare market and develop software to meet same.

211. NHTG misappropriated the Epic trade secrets including by improperly disclosing them to Focus Systems' employees and subcontractors in breach of NHTG's express contractual duty to maintain the secrecy of the Epic trade secrets set forth in the License Agreement and the Customer Schedule. As a party to the License Agreement and Customer Schedule, NHTG knew that its knowledge of the Epic trade secrets was acquired under circumstances giving rise to a duty to maintain their secrecy and limit their use.

212. Focus Solutions misappropriated the Epic trade secrets including by improperly disclosing them to Focus Systems' employees and subcontractors in breach of Focus Solutions' express contractual duty to maintain the secrecy of the Epic trade secrets set forth in the CAA and Customer Schedule. As a party to the CAA and Customer Schedule, Focus Solutions knew that its knowledge of the Epic trade secrets was acquired under circumstances giving rise to a duty to maintain their secrecy and limit their use.

213. Focus Systems misappropriated the Epic trade secrets including by improperly acquiring and using them knowing they were acquired by improper means, namely by inducing NHTG and Focus Solutions to breach their duty to Epic to maintain the secrecy of the Epic trade secrets.

214. Schaumberg misappropriated the Epic trade secrets including by improperly

35

disclosing them to Focus Systems' employees and subcontractors in breach of Focus Solutions' and NHTG's express contractual duties to maintain the secrecy of the Epic trade secrets. Schaumberg was fully aware of the terms and duties contained in the License Agreement, CAA and Customer Schedule.

215.     Schaumberg also misappropriated the Epic trade secrets including by improperly acquiring and using them on behalf of Focus Systems through improper means.   Schaumberg personally induced NHTG and Focus Solutions to breach their contractual confidentiality obligations to Epic by causing the Epic trade secrets to be disclosed to entities and individuals who were not authorized to acquire and use them, and who were not subject to contractual confidentiality restrictions.

216.     As a direct and proximate cause of Focus Systems, Focus Solutions, NHTG, and Schaumberg's deliberate, willful, and malicious misappropriation of Epic's trade secrets, Epic has sustained and will continue to sustain severe, immediate, and irreparable harm, damage, and injury to the value of its trade secrets, which Epic has expended significant time, effort, and money to develop and secure.

217.     Epic is entitled to actual damages and damages for any unjust enrichment caused by the misappropriation that is not addressed in computing damages for actual loss under the DTSA, 18 U.S.C. § 1836(b)(3)(B), in an amount to be determined at trial.

218.     An award of punitive damages under the DTSA, 18 U.S.C. § 1836(b)(3)(C), and attorneys' fees under DTSA, 18 U.S.C. § 1836(b)(3)(D), are also appropriate given the willful and malicious conduct outlined herein.

219.     As a consequence of Defendants' actions, Epic has suffered and will continue to suffer irreparable harm, injury, and loss.   Epic is entitled to an injunction under the DTSA to

prevent further misappropriation by Defendants and harm, injury, and loss to Epic. Unless enjoined, Defendants will continue to use Epic's trade secrets to gain unfair advantages and Epic will continue to suffer irreparable harm that cannot be remedied by money damages.

## SECOND CAUSE OF ACTION
Uniform Trade Secrets Act (Wis. Stat. § 134.90)
(against Focus Systems, Focus Solutions, NHTG, and Schaumberg)

220. Epic realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 219 above.

221. The Epic trade secrets identified in Paragraphs 34 through 39 above constitute "trade secrets" within the meaning of Wis. Stat. § 134.90(1)(c).

222. As outlined above, the Epic trade secrets derive independent economic value from not being generally known or readily ascertainable by proper means to Epic's competitors.

223. Epic takes significant steps to maintain the secrecy of the information, including by restricting access to Epic customers and requiring others to sign confidentiality agreements and other use restriction agreements. Epic also uses physical and technological restrictions to protect its valuable trade secret information, as described partially in this Complaint.

224. For the reasons described above, Focus Systems, Focus Solutions, NHTG, and Schaumberg acquired, disclosed and used the Epic trade secrets by improper means, or knowing that the Epic trade secrets were acquired by improper means and in violation of express contractual duties to maintain their secrecy.

225. Pursuant to Wis. Stat. § 134.90(3), Epic is entitled to an injunction to prevent the misappropriation and misuse of its trade secrets.

226. While some of the injury being caused by Focus Systems, Focus Solutions, NHTG, and Schaumberg's actions is irreparable pursuant to Wis. Stat. § 134.90(3), Epic has also suffered

37

damages as a result of Focus Systems, Focus Solutions, NHTG, and Schaumberg misappropriating Epic's trade secrets, and Epic is entitled to recover such damages from Defendants pursuant to Wis. Stat. § 134.90(4) in an amount to be proven at trial.

227. An award of exemplary and punitive damages and attorney's fees is appropriate in light of the willful and malicious misconduct of Focus Systems, Focus Solutions, NHTG, and Schaumberg outlined herein.

### THIRD CAUSE OF ACTION
Computer Fraud and Abuse Act under 18 U.S.C. § 1030
(against Focus Systems)

228. Epic realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 227 above.

229. Epic's computer system is a protected computer as that term is defined by the Computer Fraud and Abuse Act. The Azure computer systems used to host NHTG's instance of Epic's software are also a protected computer as defined by the Computer Fraud and Abuse Act.

230. Epic's computer system and the Azure computer system contain Epic Confidential Information and Epic trade secrets which are subject to contractual limitations on disclosure, use, and access.

231. Focus Systems intentionally accessed the Epic computer system and/or the Azure computer system knowing it did not have authorization to access those computer systems.

232. Focus Systems accessed the protected computers with the intent to defraud Epic by concealing access by Focus Systems employees and independent contractors that Focus Systems knew were not authorized to access those protected computers, and for the purpose of furthering the knowledge and experience of Focus Systems with Epic trade secrets so that it could market that experience to the world for profit.

233.    The conduct of Focus Systems was knowing and intentional.

234.    The actions of Focus Systems were without Epic's knowledge, permission, or authorization.

235.    The actions of Focus Systems involved computer systems connected to the internet and within interstate commerce.

236.    As a result of the violation by Focus Systems of the Computer Fraud and Abuse Act, Epic has suffered loss during a one-year period aggregating in excess of $5,000 in value. Epic will continue to be injured irreparably unless access by Focus Systems is enjoined.

237.    Epic's damages include, among other things, costs related to identifying the unauthorized access by Focus Systems' employees and subcontractors. The specific amounts of damages suffered by Epic will be set forth at the trial of this matter.

### FOURTH CAUSE OF ACTION
Computer Crimes Act under Wis. Stat. § 943.70
(against Focus Systems)

238.    Epic realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 237 above.

239.    Focus Systems willfully, knowingly, and without authorization accessed, copied, and took possession of electronic data and information belonging to Epic, without Epic's consent and without lawful authority.

240.    The conduct of Focus Systems interfered with the right of Epic to possess such property and directly and proximately caused injury to Epic.

241.    The actions of Focus Systems constitute a violation of Wis. Stat. § 943.70.

242.    As a direct and proximate result of the violation by Focus Systems and Focus Solutions of Wis. Stat. § 943.70, Epic has suffered damages and loss in a manner and amount

which will be proven at trial.

## FIFTH CAUSE OF ACTION
Federal Trademark Infringement – Lanham Act Section 31(1) (15 U.S.C. § 1114(a))
(against NOVO Health, Focus Systems, and Focus Solutions)

243.    Epic realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 202 above.

244.    The actions of NOVO Health, Focus Systems and Focus Solutions constitute trademark infringement under 15 U.S.C. § 1114.

245.    Epic holds all right, title, and interest in the EPIC Marks, including the '373 Registration, the '061 Registration, and the '055 Registration.

246.    Epic has used and continues to use the EPIC Marks to market and sell its healthcare software and services across the United States.

247.    The EPIC Marks are inherently distinctive and have acquired secondary meaning.

248.    Since 2020, NOVO Health, Focus Systems, and Focus Solutions, have used the EPIC Marks, in interstate commerce, as described in Paragraphs 54 through 66 above.

249.    Defendants' use of the Epic Marks in the manner identified in Paragraphs 54 through 66 was without permission or authorization.

250.    Defendants' use of the Epic Marks as described in Paragraphs 54 through 66 has caused and/or is likely to cause customers to mistakenly believe that all Defendants' services are sponsored by and/or affiliated with Epic, or vice-versa, and that after the termination of the License Agreement, CAA and CS, Defendants have the right to offer access to Epic's software, constituting Lanham Act trademark infringement.

251.    Defendants' infringement was and is intentional, willful, and/or in reckless disregard of Epic's trademark rights in the EPIC Marks.

QB\90506899.1

252. By infringing the EPIC Marks, Defendants have caused Epic to suffer and, unless enjoined by this Court, will cause Epic to continue to suffer injury for which Epic is entitled to damages in an amount to be proven at trial.

253. If Defendants' infringement is not enjoined, Epic will suffer irreparable harm that cannot adequately be compensated by a monetary award.

**SIXTH CAUSE OF ACTION**
False Designation of Origin – Lanham Act Section 43(a) (15 U.S.C. § 1125(a))
(against NOVO Health, Focus Systems, and Focus Solutions)

254. Epic realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 202 above.

255. Defendants' actions constitute false designation of origin under 15 U.S.C. § 1125.

256. Epic holds all right, title, and interest in the EPIC Marks, including the '373 Registration, the '061 Registration, and the '055 Registration.

257. Epic has used and continues to use the EPIC Marks to market and sell its healthcare software and services across the United States.

258. The EPIC Marks are inherently distinctive and have acquired secondary meaning.

259. Since 2020, NOVO Health, Focus Systems, and Focus Solutions, have used the EPIC Marks, in interstate commerce, as described in Paragraphs 54 through 66 above.

260. Defendants' use of the Epic Marks in the manner identified in Paragraphs 54 through 66 was without permission or authorization.

261. Defendants' use of the Epic Marks as described in Paragraphs 54 through 66 has caused and/or is likely to cause customers to mistakenly believe that all of Defendants' goods and services originate from Epic, and after termination of the License Agreement, CAA and CS, that Defendants have the right to offer access to Epic's software, constituting Lanham Act false

41

designation of origin.

262. Defendants' false designation was intentional, willful, and/or in reckless disregard of Epic's trademark rights in its EPIC marks.

263. By falsely designating its services, Defendants have caused Epic to suffer and, unless enjoined by this Court, will cause Epic to continue to suffer injury for which Epic is entitled to damages in an amount to be proven at trial.

264. If Defendants' false designation is not enjoined, Epic will suffer irreparable harm that cannot adequately be compensated by a monetary award.

**SEVENTH CAUSE OF ACTION**
Breach of Contract – Consultant Access Agreement
(against Focus Solutions)

265. Epic realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 202 above.

266. The CAA is a valid and enforceable contract between Epic and Focus Solutions.

267. Epic has performed consistent with its obligations under the CAA.

268. Focus Solutions materially breached the CAA in at least the following ways:

   a)    By disclosing Epic Confidential Information and Epic trade secrets to third parties without authorization to access that information, including Focus Systems, its employees, and its independent contractors in violation of Section 6;

   b)    By failing to access, disclose, and use Epic Confidential information as specified in the applicable Customer Schedule in violation of Section 2;

   c)    By failing to limit access to Limited Epic Software to the minimum necessary in order to provide the Services as specified in the Customer Schedule in violation of Section 2;

   d)    By failing to contract directly with NHTG to provide the Services on the Customer Schedule in violation of Section 2;

   e)    By failing to limit access to Epic Confidential Information to only those direct employees who must have that access in order to provide the services

in violation of Section 3.a.;

f)        By providing access to Epic Confidential Information to third parties not properly designated as subcontractors in violation of Section 3.b.;

g)        By failing to follow various Security Practices set forth in Section 4.d.;

h)        By accessing Epic Software source code in violation of Section 5;

i)        By failing to promptly return Epic Confidential Information in response to a written demand in violation of Section 11; and

j)        By failing to obtain Epic's written consent to use its name and trademarks in advertising, marketing, and promotions, in violation of Section 13.

269.    As a direct and proximate result of Focus Solutions' willful and material breaches, Epic has suffered damages in an amount to be proven at trial.

270.    The damages suffered by Epic were foreseeable consequences of Focus Solutions' breaches alleged herein.

271.    If Focus Solutions is allowed to continue breaching the CAA as described above, Epic will suffer irreparable harm for which it has no adequate legal remedy.

## EIGHTH CAUSE OF ACTION
Breach of Contract – Customer Schedule
(against NHTG and Focus Solutions)

272.    Epic realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 202 above.

273.    The Customer Schedule is a valid and enforceable agreement between Epic, NHTG and Focus Solutions.

274.    Epic has performed consistent with its obligations under the Customer Schedule.

275.    Focus Solutions and NHTG materially breached the CAA in at least the following ways:

a)        By failing to limit Focus Solutions' access to Limited Epic Software in accordance with the Customer Schedule in violation of Section 2.a.;

43

b)     By knowingly allowing Focus Solutions to disclose Epic Confidential Information and Epic trade secrets to third parties without authorization to access that information, including Focus Systems, its employees and its independent contractors in violation of Section 2.a.; and

c)     By failing to timely terminate access to the Limited Epic Software and any other Epic Confidential Information upon termination of the Customer Schedule.

276.   As a direct and proximate result of Focus Solutions' and NHTG's willful and material breaches, Epic has suffered damages in an amount to be proven at trial.

277.   The damages suffered by Epic were foreseeable consequences of Focus Solutions' and NHTG's breaches alleged herein.

278.   If Focus Solutions and/or NHTG are allowed to continue breaching the Customer Schedule as described above, Epic will suffer irreparable harm for which it has no adequate legal remedy.

## NINTH CAUSE OF ACTION
Tortious Interference – Consultant Access Agreement / Customer Schedule
(against Focus Systems and Schaumberg)

279.   Epic realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 202 above.

280.   Epic had contractual relationships with NHTG and Focus Solutions through the CAA and Customer Schedule.

281.   Focus Systems and Schaumberg knew about and were familiar with the terms of the CAA and Customer Schedule at the time they were executed.

282.   Focus Systems and Schaumberg intentionally and willfully interfered with Epic's contractual relationships by inducing and/or directly causing Focus Solutions to materially breach the CAA and Customer Schedule as outlined above.

283.   Focus Systems and Schaumberg intentionally and willfully interfered with Epic's

44

contractual relationships by inducing and/or directly causing NHTG to materially breach the Customer Schedule as outlined above.

284.    Focus Systems and Schaumberg intended to interfere with Epic's contractual relationships so that they could benefit by having Focus Systems' employees and independent contractors gain experience and knowledge about Epic Confidential Information, for the purpose of marketing and selling that experience for monetary gain.

285.    Focus Systems and Schaumberg were not justified or privileged to interfere with Epic's contractual relationships with NHTG and Focus Solutions through the CAA and Customer Schedule.

286.    As a direct and proximate result of Focus Systems' and Schaumberg's interference, Epic has been damaged in an amount to be proven at trial.

### TENTH CAUSE OF ACTION
Breach of Contract – Management Services Agreement
(against NEW Technology Holdings)

287.    Epic realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 202 above.

288.    The Management Services Agreement is a valid and enforceable contract between NEW Technology Holdings and NOVO Health.

289.    Epic is an intended third-party beneficiary of the Management Services Agreement between NEW Technology Holdings and NOVO Health.

290.    NEW Technology Holdings materially breached its contractual obligations to NOVO Health and Epic by failing to comply with Section 9(b) of the Management Services Agreement when it exercised its option to purchase the equity of NHTG.

291.    NEW Technology Holdings failed to cause the payoff of outstanding liabilities,

debts and accounts payable to Epic, and failed to execute a written agreement with Epic evidencing a discharge, a payment plan or other plan to satisfy the outstanding debt as required by the Management Services Agreement.

292.    NEW Technology Holdings' breach of the Management Services Agreement caused damage to Epic in an amount to be proven at trial, but no less than the amounts owed to Epic by NHTG.

## ELEVENTH CAUSE OF ACTION
Conspiracy to Injure Epic (Wis. Stat. § 134.01)
(against NEW Technology Holdings, NOVO Health, LLC, Schaumberg, Lamine and Kubiak)

293.    Epic realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 202 above.

294.    NEW Technology Holdings, NOVO Health, Schaumberg, Lamine, and Kubiak conspired and acted in concert together to breach the Management Services Agreement by preventing and hindering the satisfaction of debts owed to Epic in accordance with the Management Services Agreement.

295.    New Technology Holdings, NOVO Health, Schaumberg, Lamine, and Kubiak combined, associated, agreed, and mutually undertook the actions that prevented Epic's debt from being satisfied for the purpose of willfully and maliciously injuring Epic's business.

296.    The actions of NEW Technology Holdings, NOVO Health, LLC, Schaumberg, Lamine, and Kubiak constitute a violation of Wis. Stat. § 134.01.

297.    As a direct and proximate result of the violation by NEW Technology Holdings, NOVO Health, Schaumberg, Lamine, and Kubiak of Wis. Stat. § 134.01, Epic has suffered damages and loss in an amount to be proven at the trial of this matter, but no less than the amounts owed by NHTG to Epic.

## TWELVETH CAUSE OF ACTION
Breach of Contract – License and Support Agreement
(against NHTG)

298.　Epic realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 202 above.

299.　The License Agreement is a valid and enforceable contract between Epic and NHTG.

300.　Epic has performed consistent with its obligations under the License Agreement.

301.　NHTG materially breached the License Agreement in at least the following ways, as supported by the factual allegations above:

    a)　By failing to timely pay Epic the fees invoiced by Epic in accordance with Sections 4(a), 4(e), 4(g), 4(h), 4(i), and 4(j) of the License Agreement;

    b)　By disclosing Epic Confidential Information to unauthorized third parties in breach of the confidentiality provisions in Sections 8, and 9(c);

    c)　By permitting third parties to access Epic's Code in violation of Section 11(a) (iii);

    d)　By refusing to cease all sales and implementation activities with Affiliates after Epic informed NHTG about concerns with how NHTG was extending to and supporting its Affiliates in violation of Section 11(a)(vi);

    e)　By failing to promptly notify Epic when NHTG Affiliates intended to terminate the arrangement that allows that Affiliate to access NHTG's instance of Epic in violation of Section 11(a)(ix);

    f)　By directly marketing and offering access to NHTG's instance of Epic as the primary purpose of relationships with new entities in violation of Appx A, Definition 1;

    g)　By signing a contact with a new entity after Epic expressly disapproved of extending NHTG's instance to that entity in violation of Appx. A, Definition 1; and

    h)　By failing to comply with the Requirements for a Collaborative Install in violation of various parts of Exhibit 2(c) and 2(c)-1 of the License Agreement.

302.　As a direct and proximate result of NHTG's willful and material breaches, Epic has

suffered damages in an amount to be proven at trial, but no less than $9.4 million, the amount of fees and interest owed by NHTG under the License Agreement.

303.    The damages suffered by Epic were foreseeable consequences of NHTG's breaches alleged herein.

304.    If NHTG is allowed to continue breaching the License Agreement as described above, Epic will suffer irreparable harm for which it has no adequate legal remedy.

<u>**THIRTEENTH CAUSE OF ACTION**</u>
Account Stated – License and Support Agreement
(against NHTG)

305.    Epic realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 202 above.

306.    NHTG is liable to Epic under claims for account stated.

307.    Epic holds an account against NHTG as evidenced by the regular transmission of invoices from Epic to NHTG from the inception of the License Agreement to its termination in November, 2023.

308.    The invoices regularly transmitted by Epic to NHTG itemized the specific amounts due to Epic from NHTG.  In addition, from time to time, Epic sent a consolidated statement of account that showed all unpaid fees and interest owed to Epic by NHTG.

309.    NHTG repeatedly acknowledged that it owed the invoiced amounts to Epic and never contested any amounts owed as required by the License Agreement.

310.    NHTG repeatedly promised Epic that it would pay the invoiced amounts owed and Epic relied upon those promises.

311.    As such, NHTG is liable to Epic in the amount of $6.8 million on an account stated, representing amounts previously invoiced to NHTG.

## **FOURTEENTH CAUSE OF ACTION**
### Tortious Interference – License and Support Agreement
(against NOVO Health, Focus Systems, Focus Solutions, NEW Technology Holdings, and
Schaumberg)

312.    Epic realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 202 above.

313.    Epic had a contractual relationship with NHTG through the License Agreement.

314.    At all material times, NOVO Health, Focus Systems, Focus Solutions, NEW Technology Holdings, and Schaumberg knew about and were familiar with the terms of the License Agreement.

315.    Defendants intentionally and willfully interfered with Epic's contractual relationships by inducing and/or directly causing NHTG to materially breach the License Agreement as outlined above.

316.    Defendants intended to interfere with Epic's contractual relationship so that they could benefit by convincing Epic to defer or forego payment for outstanding fees, and to force Epic to rewrite the contract to permit NHTG to extend the use of its instance of Epic to Affiliates that otherwise would not have been approved by Epic.  Defendants interfered with the License Agreement in an effort to recoup investments made in NHTG that NHTG had no obligation to pay back to them.

317.    Defendants were not justified or privileged to interfere with Epic's contractual relationships with NHTG through the License Agreement.

318.    As a direct and proximate result of Defendants' interference, Epic has been damaged in an amount to be proven at trial.

QB\90506899.1

## FIFTEENTH CAUSE OF ACTION
Piercing/Alter Ego
(against NOVO Health and NEW Technology Holdings)

319.    Epic realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 202 above.

320.    Epic asserts causes of action 1, 2, 8, and 12-13 above against NHTG.

321.    From the date of NHTG's formation through May 30, 2023, NOVO Health was the sole member of NHTG.

322.    From May 31, 2023 through the present, NEW Technology Holdings was the sole member of NHTG.

323.    At the times that NOVO Health and NEW Technology Holdings were the sole member, respectively, of NHTG, they exercised complete domination and control over the finances, policies, business practices such that NHTG had no separate mind, will or existence of its own.

324.    Upon information and belief, NHTG did not observe corporate formalities, did not pay dividends, caused funds to be siphoned to related entities or individuals, did not maintain adequate corporate records, failed to hold board meetings, intermingled funds with other entities, and was inadequately capitalized.

325.    The control imposed by NOVO Health, and later NEW Technology Holdings, over NHTG, was used to commit fraud and wrongdoing against Epic in violation of various statutory, contractual and common law duties and obligations, as described above.

326.    The control and breaches of duty discussed above directly and proximately caused injury and damages to Epic as described above.

327.    For the foregoing reasons, NOVO Health and NEW Technology Holdings should

QB\90506899.1

be held jointly and severally liable for the causes of action against NHTG.  Failure to hold these alter egos liable would result in an injustice.

## SIXTEENTH CAUSE OF ACTION
Piercing / Alter Ego
(against Schaumberg and Lamine)

328.  Epic realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 202 above.

329.  At all material times, Schaumberg and Lamine were the sole members of NEW Technology Holdings.

330.  At all material times, Schaumberg and Lamine were the sole members of Focus Systems.

331.  At all material times, Schaumberg was the sole member of Focus Solutions.

332.  Epic asserts causes of action 10-11, and 14-15 against NEW Technology Holdings.

333.  Epic asserts causes of action 1-2, 5-8, and 14 against Focus Solutions.

334.  Epic asserts causes of action 1-6, 9, and 14 against Focus Systems.

335.  At all material times, Schaumberg and/or Lamine exercised complete domination and control over the finances, policies, and business practices of NEW Technology Holdings, Focus Solutions and Focus Systems, such that those entities had no separate mind, will or existence of their own.

336.  Upon information and belief, NHTG, NEW Technology Holdings, Focus Solutions and Focus Systems did not observe corporate formalities, caused funds to be siphoned to related entities or individuals, did not maintain adequate corporate records, failed to hold board meetings, intermingled funds with other entities, and were inadequately capitalized.

337.  The control imposed by Schaumberg and Lamine over their entities was used to

commit fraud and wrongdoing against Epic in violation of various statutory, contractual and common law duties and obligations, as described above.

338.    The control and breaches of duty discussed above directly and proximately caused injury and damages to Epic as described above.

339.    For the foregoing reasons, Schaumberg and Lamine should be held jointly and severally liable for the causes of action against their wholly owned and controlled entities.  Failure to hold these alter egos liable would result in an injustice.

### SEVENTEENTH CAUSE OF ACTION
Piercing / Alter Ego
(against Kubiak)

340.    Epic realleges and incorporates by reference herein each allegation contained in paragraphs 1 through 202 above.

341.    At all material times, Kubiak was the founder, CEO and a member of NOVO Health.

342.    Epic asserts causes of action 5-6, 11, 14, and 15 against NOVO Health

343.    At all material times, Kubiak exercised complete domination and control over the finances, policies, and business practices of NOVO Health, such that those entities had no separate mind, will or existence of its own.

344.    Upon information and belief, NOVO Health did not observe corporate formalities, caused funds to be siphoned to related entities or individuals, did not maintain adequate corporate records, failed to hold board meetings, intermingled funds with other entities, and was inadequately capitalized.

345.    The control imposed by Kubiak over NOVO Health was used to commit fraud and wrongdoing against Epic in violation of various statutory, contractual and common law duties and

obligations, as described above.

346. The control and breaches of duty discussed above directly and proximately caused injury and damages to Epic as described above.

347. For the foregoing reasons, Kubiak should be held liable for the causes of action against NOVO Health. Failure to hold Kubiak liable would result in an injustice.

## PRAYER FOR RELIEF

WHEREFORE Epic seeks the following relief from this Court:

A. Permanent injunctive relief appropriately fashioned by the District Court to prevent further injury to Epic, and to prevent Focus Solutions, Focus Systems, NHTG, and Schaumberg (the "trade secret Defendants") from further benefiting from their misconduct as alleged herein, including but not limited to injunctive relief:

1. Requiring the trade secret Defendants to cease all use of any Epic trade secrets acquired in violation of law;

2. Requiring the trade secret Defendants to not disclose any Epic trade secrets taken from Epic in violation of law;

3. Requiring the trade secret Defendants to immediately destroy and/or permanently delete (1) all copies of Epic documents and information in any form (electronic or hardcopy) including without limitation any trade secret and confidential information acquired from Epic; and (2) all copies of any materials in any form containing any, or derived from any, Epic trade secret or confidential information;

4. Requiring the trade secret Defendants to provide a detailed accounting of their search for and destruction of the documents and information

QB\90506899.1

described in (3) above, including providing a list of all documents or information destroyed or deleted;

5.    Preventing the trade secret Defendants from any further unauthorized access, or access exceeding authorization, of any computer network or system of Epic, including, without limitation, Epic's UserWeb and/or NHTG's instance of Epic on Azure;

6.    Preventing the trade secret Defendants from further improper use or disclosure of the Epic trade secrets or confidential information; and

7.    Preventing the trade secret Defendants from selling or offering to sell products that utilize, embody, or were developed or enhanced using the Epic trade secrets and/or confidential information;

B.    An award of the actual and consequential damages and loss that Epic has sustained as a result of the trade secret Defendants' wrongdoing;

C.    Disgorgement of the trade secret Defendants' profits arising from the benefits of the trade secret Defendants' use of Epic's confidential and proprietary information;

D.    An award of all costs of investigation and litigation related to trade secret Defendants' theft and misappropriation of Epic trade secrets and/or confidential information;

E.    An award of punitive damages against the trade secret Defendants in an amount to be determined at trial;

F.    A judgment that NOVO Health, Focus Solutions, and Focus Systems (the "trademark Defendants"), have infringed the EPIC marks in violation of 15 U.S.C. § 1114;

G.    An award of damages adequate to compensate Epic for infringement by the trademark Defendants, but no less than the damages and/or disgorgement of profits permitted by

54

15 U.S.C. § 1117 and other applicable authority;

H.      A judgment against the trademark Defendants, that they have committed false designation of origin in violation of 15 U.S.C. § 1125;

I.      A judgment that the false designation of origin by the trademark Defendants has been intentional, willful, and/or reckless;

J.      An award of damages adequate to compensate Epic for false designation of origin by the trademark Defendants, but no less than the damages and/or disgorgement of profits permitted by 15 U.S.C. § 1117 and other applicable authority;

K.      An award of enhanced damages pursuant to 15 U.S.C. § 1117;

L.      An award of compensatory and punitive damages, under the authority described above and any other applicable authority;

M.      Injunctive relief pursuant to 15 U.S.C. § 1116 and/or any other applicable authority prohibiting the trademark Defendants from continuing to violate Epic's trademark rights in any way;

N.      A judgment that acts of trademark infringement and false designation of origin by the trademark Defendants warrant a finding that this is an exceptional case;

O.      An award of reasonable attorneys' fees incurred herein pursuant to 15 U.S.C. § 1117 and/or any other applicable authority;

P.      An award against Focus Solutions for the damages caused by its breach of the Consultant Access Agreement;

Q.      An award of damages against NHTG and Focus Solutions for their breach of the Customer Schedule;

R.      An award of damages against Focus Systems and Schaumberg for tortiously

interfering with the Consultant Access Agreement and Customer Schedule;

S.     An award of damages against NEW Technology Holdings for its breach of the Management Services Agreement;

T.     An award of damages against NEW Technology Holdings, NOVO Health, Schaumberg, Lamine, and Kubiak for their violations of Wis. Stat. § 134.01;

U.     An award of damages no less than $9.4 million against NHTG for its breaches of the License Agreement;

V.     An award of damages against NHTG for no less than $6.8 million on an account stated;

W.     An award of damages against NOVO Health, Focus Systems, Focus Solutions, NEW Technology Holdings, and Schaumberg for tortious interference with the License Agreement;

X.     An award of damages against NOVO Health and NEW Technology in the amounts awarded against their alter ego and instrumentality, NHTG;

Y.     An award of damages against Schaumberg and Lamine for any damages awarded against NEW Technology Holdings, Focus Solutions, and Focus Systems, as the alter egos and instrumentalities of Schaumberg and Lamine;

Z.     An award of damages against Kubiak for any damages awarded against NOVO Health as the alter ego and instrumentality of Kubiak.

AA.     An award of Epic's costs and expenses;

BB.     An award of pre- and post-judgment interest;

CC.     To the extent not already addressed above, an award of the reasonable attorney's fees incurred by Epic in pursuing this matter in accordance with any applicable laws; and

DD.    Such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Epic respectfully demands a trial by jury on all issues so triable.

Dated the 12th day of June, 2024.

*/s/ Matthew J. Duchemin*
Kristin Graham Noel
kristin.noel@quarles.com
Matthew J. Duchemin
matthew.duchemin@quarles.com
QUARLES & BRADY LLP
33 East Main Street, Suite 900
Madison, WI 53703
Tel.: (608) 251-5000
Fax: (608) 251-9166

Nathan J. Oesch
nathan.oesch@quarles.com
Shauna D. Manion
shauna.manion@quarles.com
QUARLES & BRADY LLP
411 East Wisconsin Avenue, Suite 2400
Milwaukee, WI 53202

*Attorneys for Plaintiff Epic Systems Corporation*

QB\90506899.1